**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| DANIEL J. HERBERT | : |
| PLAINTIFF, | : |
| | : CIVIL ACTION NO. 3:08cv1945 |
| | (VLB) |
| | : |
| v. | : June 16, 2011 |
| | : |
| NATIONAL AMUSEMENTS, INC., | : |
| DEFENDANT | : |

## MEMORANDUM OF DECISION DENYING IN PART AND GRANTING IN PART DEFENDANT'S [DOC. #36] MOTION FOR SUMMARY JUDGMENT

Before the Court is a motion for summary judgment filed by the Defendant, National Amusements, Inc. ("National Amusements"). The Plaintiff, David J. Herbert ("Herbert"), brought this suit claiming National Amusement's termination of his employment violated the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.,* the Connecticut Fair Employment Practices Act (CFEPA), Conn. Gen. Stat. § 46a-60(a) *et seq.*, and Connecticut common law for termination in violation of public policy. National Amusements argues that Herbert has failed to set forth sufficient evidence for a reasonable jury to find that 1) National Amusements fired Herbert because of his age, or 2) National Amusements fired Herbert in violation of public policy. For the reasons stated hereafter, the Defendant's motion for summary judgment should be denied as to Plaintiff's ADEA and CFEPA claims and granted with respect to Plaintiff's claim for termination in violation of public policy.

<u>**Facts**</u>

The following facts relevant to the Defendant's motion for summary judgment are undisputed, unless otherwise indicated. Herbert was born on October 20, 1954. He was employed by National Amusements, which operates movie theatres, as a Manager from December 16, 1996 until February 27, 2007. Herbert was hired to be a Manager at the Showcase Cinemas in East Hartford, Connecticut. He was age 42 at the time of hire, and was an at-will employee. [Doc. #13].

Herbert's duties as a Manager were broad, and included running projectors, preparing sales and administrative reports, overseeing staff, dealing with safety issues, and addressing the needs of the theatre's patrons, among other tasks. During his employment with National Amusements, Herbert was transferred to West Springfield, Massachusetts in 1997, and back to East Hartford in 2000. In 2002, he was promoted to the position of District Safety Representative ("DSR"), where he traveled to theatres in Southern Connecticut 2-3 days per week, while still maintaining his duties as a Manager in East Hartford. In 2004, National Amusements restructured their safety program, the DSR position was dissolved, and Herbert returned to being a full-time manager in East Hartford. When the East Hartford theatre closed in August 2006, Herbert was transferred to a Manager position in Berlin for a month, then to a Manager position in Southington, which he retained until he was terminated. [Doc. # 36-2, Defendant's Rule 56(a)(1) Statement].

During Herbert's employ at National Amusements, Managers were supervised by Managing Directors, who conducted written performance evaluations twice yearly. Managing Directors also issued written Employee Development Alerts ("EDAs") to Managers to apprise them of problems with their work, including issues with attendance, performance, policy violations, or other concerns. Employees were free to indicate their agreement or disagreement with any EDA, and to provide comments if they chose to do so. Although Managing Directors typically had some discretion in the disciplinary process, generally once a Manager received three or four EDAs, they would be given a "Decision Making Day" ("DMD") to decide whether they would commit to improving their performance, or would prefer to resign. The Manager would then indicate their decision on a form, and if they committed to improving, they were required to write down specific steps or actions to improve their performance. [Doc. # 36-2, Defendant's Rule 56(a)(1) Statement].

Herbert received his first evaluation in June 1997, and was regularly evaluated until his termination in 2007. He received an EDA dated May 10, 2002 for punctuality, which he signed indicating his agreement. He received an EDA dated January 13, 2004 for closing a theatre early on Christmas Eve, to which Herbert indicated his disagreement and wrote a rebuttal memo. He received an EDA dated December 19, 2005 for failure to properly schedule ushers, to which Herbert indicated his disagreement and

wrote a rebuttal memo.  He received an EDA on February 21, 2007, citing unsatisfactory work performance during his shift on February 13, 2007, by Jeff Brainard who was Herber's Managing Director at the time, to which Herbert indicated his disagreement and wrote a rebuttal memo.  He was given a DMD form on February 23, 2007.  Herbert signed the form indicating that he sincerely and fully committed to an acceptable level of performance, but rather than listing the actions he would take to improve, he attached a written memo noting his disagreement with the Company's actions and requesting that his most recent performance evaluation be re-done.  [Doc. # 36-2, Defendant's Rule 56(a)(1) Statement].

Following Herbert's response to the DMD form, he was terminated on February 27, 2007.  Herbert was 52 years old at the time of his termination. Subsequent to Herbert's termination, the part-time Assistant Manager at the Southington theatre, Jonathan Williams, indicated his interest in becoming a full-time Manager and was promoted to the position.  Williams was 20 years old at the time of his promotion.  [Doc. # 36-2, Defendant's Rule 56(a)(1) Statement].

**Standard**

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of proving that no factual issues exist.  *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether

that burden has been met, the court is required to resolve all ambiguities

and credit all factual inferences that could be drawn in favor of the party

against whom summary judgment is sought." *Id.*, (citing *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "If there is any evidence in

the record that could reasonably support a jury's verdict for the non-

moving party, summary judgment must be denied." *Am. Home Assurance*

*Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir.

2006) (internal quotation marks and citation omitted).


Analysis of Plaintiff's ADEA Claim

Herbert's ADEA discrimination claim is governed by the *McDonnell*

*Douglas* standard:

> To withstand a motion for summary judgment, a discrimination
> plaintiff must withstand the three-part burden-shifting [test]
> laid out by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93
> S. Ct. 1817, 36 L. Ed. 2d 668 (1973). . . . In a nutshell, a plaintiff
> first bears the 'minimal' burden of setting out a *prima facie*
> discrimination case, and is then aided by a presumption of
> discrimination unless the defendant proffers a 'legitimate,
> nondiscriminatory reason' for the adverse employment action,
> in which event, the presumption evaporates and the plaintiff
> must prove that the employer's proffered reason was a pretext
> for discrimination.

*McPherson v. N.Y.C. Dep't. of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006)

(internal citation omitted).   While the Supreme Court recently noted that it

"had not definitively decided whether the evidentiary framework of

*McDonnell Douglas* … is appropriate in the ADEA context," *Gross v. FBL*

*Fin. Servs., Inc.*, 129 S. Ct. 2343, 2349 n. 2 (2009), the Second Circuit has

held that post-*Gross* the *McDonnell Douglas* framework is still applicable to ADEA claims however the latter part of the *McDonnell Douglas* formulation has been altered by "eliminating the mixed-motive analysis that circuit courts had brought into the ADEA from Title VII cases." *Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 92, 106 (2d Cir. 2010) (finding post-*Gross* that "we remain bound by, and indeed see no reason to jettison, the burden-shifting framework for ADEA cases that has been consistently employed in our Circuit"); *Hrisinko v. N.Y.C. Dep't of Educ.*, 369 F.App'x. 232, 234 (2d Cir. 2010) (finding that employees must now prove that "age was the 'but-for' cause behind the employer's adverse decision, and not merely one of the motivating factors.")

Under *McDonnell Douglas*, "The plaintiff must first establish a *prima facie* case by demonstrating that: (1) [he] is a member of a protected class; (2) [his] job performance was satisfactory; (3) [he] suffered adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination." *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006). "A plaintiff's burden of establishing a *prima facie* case is *de minimis*." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001). The parties agree that Herbert has established the first and third prongs of this analysis, by virtue of his age and the fact that he was disciplined and subsequently terminated. However, the parties disagree as to whether Herbert can establish the second and fourth prongs of the analysis.

When considering whether job performance is satisfactory, the court should focus on whether the plaintiff had the necessary skills for performing the job, and whether the job was performed in accordance with the employer's criteria for satisfactory performance. *See Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 492 (2d Cir. 2010). Furthermore, "[a]lthough misconduct indicates a high likelihood that an employee's performance is not satisfactory, this is not necessarily the case. Depending on the employer's standards, it is at least theoretically possible that an employee committed some misconduct and yet, in the aggregate, performed satisfactorily." *Thornley v. Penton Pub., Inc.*, 104 F.3d 26, 29-30 (2d Cir. 1997).

National Amusements' evaluation forms permitted the Managing Directors to review a Manager's performance in several areas as "Outstanding", "Superior", "Good", "Fair", or "Unsatisfactory". [Doc. #41-2, Exhibit B]. In 2000, the review scheme was changed to "Superior", "Outstanding", "Good", "Fair", or "Poor". [Doc. #41-8, Exhibit H].[1] Each evaluation sheet provided space for comments and suggestions for improvement. Although the Managing Directors always provided written comments as to what areas needed improvement, and suggestions for improving performance, Herbert never received an Unsatisfactory or Poor review in any area of any evaluation. [Docs. ##41-2 to 41-20, Ex. B-T; Doc.

---

[1] The evaluation sheets described the review classifications as follows. "Superior. Has mastered this skill. Either knows or completes these tasks thoroughly." "Outstanding. Accomplished and thoroughly knowledgeable in this area." "Good. Meets all company standards." "Fair. Further improvement possible with time and effort." "Poor. Needs substantial improvement (unacceptable)."

#26-8, Ex. 21]. In his final evaluation, dated January 3, 2007, Herbert's performance was evaluated as follows: Superior Plus in two areas, Outstanding Plus in one area, Outstanding Minus in four areas, Good Plus in thirty seven areas, Good Minus in twenty three areas, Fair Plus in eleven areas, and Fair Minus in one area. [Doc. #26-8, Ex. 21].

National Amusements argues that Herbert's job performance was "seriously deficient" and worsened over time, and point to his EDA's as well as his last performance evaluation as proof of his deficiencies. National Amusement also notes that Herbert throughout his employment received poor marks in his evaluations for leadership ability, self-confidence and initiative and such attributes are key to good management performance. While Herbert's evaluations indicated that he did not perform well in connection with certain key leadership skills, he maintains that overall his performance was satisfactory and points to the fact that he also received many outstanding ratings in other skills throughout his employment. Herbert further highlights that his continued employment over ten years accompanied by regular pay increases speaks to his satisfactory job performance. Despite Herbert's "Fair" reviews in certain areas of his job performance, and his receipt of four EDAs, viewing the facts in the light most favorable to the Plaintiff, a reasonable jury could possibly find Herbert's job performance satisfactory in the aggregate, based on a lack of "Poor" reviews and his continued employment with

National Amusement.  Therefore, a genuine issue of material fact exists as to whether Herbert's job performance could be considered satisfactory.

In regard to the fourth prong of the analysis, Herbert argues that an inference of discrimination arises from the promotion of Williams, who was 20 years old when he was promoted, to replace Herbert, who was 52 years old when he was terminated.  [Doc. # 36-2].  Although an inference of discrimination does not arise when a plaintiff is replaced by another person who is only slightly younger, the courts have held that an age difference of eight years is "not insignificant".  *Tarshis v. Riese Org.*, 211 F.3d 30, 38 (2d Cir. 2000), *abrogated by Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002) on other grounds.  Furthermore, this court has noted that a "twelve year age difference certainly suffices as a substantial discrepancy in age to raise an inference of discrimination."  *Pleau v. Centrix, Inc.*, No. 06cv01626(DJS), 2008 WL 4380515, at *5 (D. Conn. Sept. 24, 2008).  Here, a thirty-two year age difference between Herbert and his replacement goes above and beyond the substantial discrepancy in age to give rise to an inference of age discrimination.

Viewing the facts in the light most favorable to the Plaintiff, a reasonable jury could find that Herbert has established a case of *prima facie* discrimination based on age.  National Amusements proffers a legitimate, non-discriminatory reason for its adverse employment discrimination to rebut the presumption of discrimination established by the Plaintiff's *prima facie* case.  The Defendant asserts that Herbert was

terminated due to his long-standing performance issues and because he was insubordinate in refusing to submit a specific plan for improving his performance as required by National Amusements on his DMD form.  In support of this assertion, National Amusements states that Herbert's EDA issued in February 2007 indicates his failure to accomplish tasks as expected, that Herbert's deficiencies had been noted by Managing Directors throughout his employment, and that Herbert refused to properly complete the DMD form as instructed.  [Doc. # 36-2].  National Amusements also notes that Managers who worked with Herbert attested to his deficiencies and stated that, given the length of his experience, his skills were poor.  The totality of these circumstances does give rise to a genuine issue of material fact as to whether the asserted performance deficiencies are pretextual.

To survive summary judgment, Herbert must show that National Amusements' proffered reasons for termination are not only a  pretext for discrimination, but that his age was the "but-for" cause for his termination. *See McPherson*, 457 F.3d at 215.  "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000).  "[T]he Supreme Court's decision in *Reeves* clearly mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his ultimate burden of

persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000); *Gross*, 129 S.Ct. at 2351; *see also Gorzynski*, 596 F.3d at 106.

In stating that National Amusements' proffered reason for termination is a pretext for discrimination, Herbert contends that the Managing Director at the Southington theatre, Jeff Brainard, was biased against Herbert on the basis of his age. In support of this contention, Herbert asserts that Brainard typically promoted Managers to their positions when they were in their 20's and 30's, that Brainard commented on the Plaintiff's age during the course of his last performance evaluation, and that Brainard decided to replace Herbert with the much-younger Williams. *See Diello v. Potter*, No. 10-1776-cv, 2011 WL 802323, at *2 (2d Cir. March 2, 2011) (noting that plaintiff's pretext allegations might have been plausible had plaintiff "provided compelling evidence of a pattern of promotions of younger employees over older employees"). Herbert also questions whether his performance was so poor that it would have led to negative evaluations, written warnings, and ultimately termination in the absence of Brainard's bias against Herbert on the basis of age.

When Herbert began working at the Southington theatre on October 9, 2006, he was reporting to Managing Director Brainard. The other full-time Managers in Southington at that time were Bethany Fissette, Bill Despins, and Larry McBreairty, as well as part-time Assistant Manager Williams, and Manager of Concession Operations ("MCO") Kim Pienkowski.

Based on the parties' uncontested statements of fact, the only person whom it is clear Brainard had a hand in promoting was Williams, who was indeed promoted to the position of full-time Manager at age 20. This information can be supplemented by Brainard's deposition and the Managers' employee files. Brainard recalls that he hired Kim Pienkowski as a Manager when she was in her late twenties, and that she was later promoted to MCO. [Doc. #41-48, Ex. WW, Brainard Depo. 38, 42]. Pienkowski was born in 1970, and was about 26 years old when Brainard hired her. [Doc. #41-22, Ex. V]. Brainard hired Larry McBreairty in the late 1990s as a Customer Service Manager; that position was dissolved and he became a Manager shortly after his hire. [Doc. #41-48, Ex. WW, Brainard Depo. 42-43]. McBreairty was born in 1965, and was about 33 years old when Brainard hired him. [Doc. #41-23, Ex. W]. Brainard promoted Bill Despins from a cashier to a Manager in the late 1990s. [Doc. #41-48, Ex. WW, Brainard Depo. 43-45]. Despins was born in 1965, and was about 30 years old when he was promoted from cashier to Manager. [Doc. #41-24, Ex. X]. Bethany Fissette was originally hired as a staff person, and Brainard had a hand (with other managers) in promoting her to Assistant Manager, then Manager. [Doc. #41-48, Ex. WW, Brainard Depo. 45-46]. Fissette was born in 1979 [Doc. #41-25, Ex. Y], but evidence of her age at promotion to Manager does not appear to be in the record, however she was younger than her present age of 32.

It is therefore true that the Managers working at the Southington theatre around the time of Herbert's termination were either hired as Manager or promoted to a Manager position by Brainard, the youngest at 20 years of age and the oldest at 33 years of age. In comparison, Herbert, who was not hired or promoted by Brainard, was 42 years old when hired as a Manager. It is difficult to say with certainty whether this trend would persuade a jury that Brainard discriminated against Herbert because of his age, however such evidence could support a finding that there is a genuine issue as to the material fact of whether Brainard, who was a central figure in Herbert's termination, was biased against Herbert on the basis of his age. [Doc. #41-48, Ex. WW, Brainard Depo. 34].

Herbert also contends that Brainard made a negative age-based comment while the two parties were reviewing Herbert's latest performance review. According to Herbert, Brainard remarked that Herbert was the oldest Manager in the theatre, older even than Brainard himself. [Doc. #41-47, Ex. VV, Herbert Depo. 182]. Brainard made other comments during this interaction that were focused on Herbert's experience but could also potentially be construed as related to his age. Brainard stated that Herbert could no longer do things "the old way". [Doc. #41-47, Ex. VV, Herbert Depo. 183]. According to Brainard, his message to Herbert was that he wasn't a new Manager, that he expected more from a Manager of 10-11 years, and that his level of performance was unacceptable for a Manager with that level of experience. [Doc. #36-16, Ex. 52-2, Brainard Depo. 201-

03].  Brainard said that Herbert should be bringing new ways of doing things to the table, to see if the management could improve the operation.  [Doc. #36-16, Ex. 52-2, Brainard Depo. 201-03].  Herbert only cites this one age-based remark, whereas all of the other remarks were experience-based remarks.  [Doc. #36-14, Ex. 51, Herbert Depo. 263-64].

Although the parties contest the precise phrasing of any statements that were made, barring any evidence that such statements were not made, this court will not draw any conclusion as to what was or was not said.  The Defendant contends that, even if the statements were made, they would be characterized as "stray remarks" insufficient to support an inference of age discrimination.  "Stray remarks by an employer do not prove discriminatory animus unless there is a causal connection to plaintiff's alleged adverse employment action."  *Trojanowski v. Blakeslee Prestress, Inc.*, No. 3:08cv548 (WWE), 2009 WL 3340426, at *4 (D. Conn. Oct. 15, 2009).   The decision to terminate Herbert was ultimately made by Ken Ditta, the District Manager, and Jeff Aldrich, in Operations.  [Doc. # 36-17, Ex. 53, Ditto Depo. 119-120].  Although according to Defendant, the discussion leading up to the decision to terminate focused on performance rather than age, it was the EDA which Brainard had submitted that prompted the submission of the DMD form and the resulting decision to terminate Herbert.  It is therefore plausible that Brainard's age-based comment as well as his other comments reflected his discriminatory animus which caused him to inappropriately issue the 2007 EDA leading to Herbert's termination.

In addition, the Second Circuit has noted that "the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination," while "[t]he more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative the remark will be." *Tomassi v. Insignia Fin. Group, Inc.*, 478 F.3d 111, 115 (2d Cir. 2007)(citations omitted). The comments made by Brainard that Herbert could no longer do things "the old way" but instead should be bringing new ways of doing things shortly before the issuance of the 2007 EDA can be considered closely related to the alleged discriminatory behavior – that of terminating Herbert and replacing him with a much younger individual who would presumably do things in the desired "new ways." [Doc. #36-16, Ex. 52, Brainard Depo. 201-03].

Moreover, it is hard to see how Brainard's age-related comment could be considered a stray remark in the first place when it was made during Herbert's performance evaluation. This is not the case of water-cooler chatter but instead a comment made directly to Herbert as a part of a performance evaluation that Defendant is relying on as justification for terminating Herbert. *Williams v. City of New York*, No. 04 CIV 1993, 2005 WL 839103, at *9 (S.D.N.Y. April 12, 2005) (noting that a stray remark unrelated to an evaluation does not constitute evidence of discrimination). Here there can be no dispute that the remark was related to his evaluation. Accordingly, a reasonable juror could find that Brainard's comments were

not simply "stray remarks," but instead provide probative evidence of discriminatory animus.

Finally, Herbert questions whether his performance was so poor that it would have led Brainard to give him a negative evaluation and an EDA in the absence of a bias against Herbert's age. The only evaluation Brainard conducted was Herbert's final evaluation. In his final evaluation, dated January 3, 2007, Herbert's performance was evaluated as follows: Superior Plus in two areas, Outstanding Plus in one area, Outstanding Minus in four areas, Good Plus in thirty seven areas, Good Minus in twenty three areas, Fair Plus in eleven areas, and Fair Minus in one area. [Doc. #36-8, Ex. 21]. In the preceding evaluation, dated June 30, 2006 and performed by Bob Moch, the Managing Director in East Hartford, Herbert's performance was evaluated as follows: Outstanding Plus in five areas, Outstanding Minus in twelve areas, Good Plus in thirty two areas, Good Minus in twenty six areas, and Fair Plus in nine areas. [Doc. #36-7, Ex. 20]. Many of the lower marks within both reviews were with regard to Herbert's leadership skills. Moch's evaluation of Herbert is more satisfactory than Brainard's in that it contains no Fair Minus reviews, but it also notably contained no Superior reviews, which Brainard did award. Although Moch did appear to give more Outstanding reviews than Brainard did, the evaluations appear to be, in large part, very similar. The Plaintiff asserts that Brainard was the specific Managing Director who gave a negative performance evaluation, but in light of the similarity to Moch's evaluation six months prior, it

appears that Brainard's evaluation of Herbert's performance was not significantly more negative than his previous evaluation. As Defendant points out, there were similarities and consistencies between the previous evaluations that Herbert received from his prior supervisors and Brainard. Moreover throughout these prior reviews, Herbert had performed poorly in connection with leadership ability and initiative which are skills crucial to a manager's position. Accordingly, Brainard's evaluation alone is likely not probative of a discriminatory animus.

However, Brainard provided feedback regarding Herbert's experience in the performance evaluation that could potentially be construed as age-related: "[f]or an individual with 11 years of management experience, David's skill set is unacceptably poor " and "[h]e has more 'experience' than any of my managers, yet he brings very little to the table." [Doc. # 36-8, Ex. 21]. Moreover, Managing Director Moch, who evaluated Herbert's performance in a manner similar to Brainard, never issued Herbert an EDA. The fact that Brainard issued Herbert an EDA citing poor performance on February 21, 2007, less than two months after the performance evaluation by Brainard which indicated that Herbert was performing on the whole satisfactorily could potentially be seen as discriminatory. A reasonable juror could find on the basis of the experience-based comments by Brainard in Herbert's evaluation and review coupled with the one explicit age-related comment Brainard made,

and the fact that Brainard and not Moch issued an EDA to Herbert that Brainard's actions were caused by his discriminatory animus.

In assessing whether, age-related bias was the "but-for" cause of Herbert's termination, it is important to examine the chain of events that led to the actual termination and what role Brainard, who Plaintiff contends was biased against his age, played in those events. The 2007 EDA issued was the disciplinary action that sparked the issuance of the DMD forms, which led to Herbert's termination. National Amusement's company policy was to issue a DMD form after the third or fourth EDA, and yet no DMD form was issued after Herbert's third EDA in 2005. [Doc. # 36-2]. This court therefore looks to the 2007 EDA to determine Brainard's role in Herbert's termination, and whether the allegations in the EDA are reasonable. As stated previously, it was Ken Ditta and Jeff Aldrich, not Brainard, who ultimately decided to terminate Herbert following his response to the DMD form. [*Id.*]. However, if Brainard manipulated or influenced their decision by discriminatorily issuing the 2007 EDA, "but-for" causation could be found. Shortly after Herbert's transfer to the Southington theatre, Brainard mentioned concerns to Ditta, who passed these concerns along to Aldrich, that Brainard was disappointed in Herbert's performance given all the years he had worked with the company and reflected that disappointment in Herbert's January 2007 evaluation. [Doc. # 36-2]. After Herbert refused to sign his evaluation indicating that he disagreed with Brainard's comments, Ditta requested more information regarding Herbert's work

18

performance. Brainard wrote a detailed memo expressing his concerns about Herbert's performance. Ditta also sought input from Herbert's past two managers, Tim Hevrin at Berlin and Bob Moch at East Hartford, who also provided written memos indicating concerns similar to Ditta's. [*id.*]

It is clear that the three most recent Managing Directors who supervised Herbert had concerns about his performance, which could justify Herbert's termination. However, this court finds it problematic that, despite the long-term nature of these concerns, no action was taken until Brainard shared the results of his January 2007 evaluation with Ditta and Aldrich. Bob Moch, who had actually been Herbert's first supervisor in 1996, was transferred to the Managing Director position in East Hartford in 2005, where he again became Herbert's supervisor. National Amusements asserts that Moch expressed concerns about Herbert's performance at that time to Ditta and Aldrich. [Doc. #36-20, Ex. 59, Moch Aff. ¶ 12]. However, Herbert responds that Ditta was allegedly "surprised" when Brainard raised similar concerns in 2007. [Doc. #41-49, Ex. XX, 74]. Likewise, Hevrin contacted Ditta to raise concerns about Herbert's performance during his short employ at the Berlin theatre. [Doc. #36-17, Ex. 53, Ditta Depo. 65-71]. Despite his concerns, Hevrin allegedly told Ditta that he did not want to take action with respect to these issues. [Doc. #36-17-49, Ex. 53, Ditta Depo. 67]. The concerns regarding Herbert's work performance therefore appear consistent amongst these managers, and they were shared with Ditta and Aldrich, yet no adverse employment action was contemplated

until Brainard issued the fourth EDA.  If these concerns regarding Herbert's performance were known and shared over at least a two-year period, it is troublesome that they were not acted upon until Brainard issued the EDA.

There is no dispute between the parties that it was Brainard's issuance of the 2007 EDA which prompted the issuance of the DMD form leading to Herbert's termination.  The parties only dispute Brainard's motivation in issuing the EDA.  Plaintiff contends that Brainard's motivation was discriminatory whereas Defendant contends Brainard properly issued the EDA in response to Herbert's poor performance.  The EDA was issued following an allegation that Herbert had not performed all his required tasks during his shift on February 13, 2007.  Brainard discussed the situation with Ditta, who advised Brainard to issue the EDA.  Since this was Herbert's fourth EDA, and company policy recommended issuing DMD forms following three or four EDAs, Herbert received his DMD forms on or about the same day.  The EDA states several tasks that Herbert failed to accomplish on February 13th, including failure to build and break down films, failure to make changes on a print, and leaving the theatre at 2 AM after not having done work for the last two hours.  Herbert replied in his rebuttal memo that another Manager had voluntarily built the film he was responsible for, that the print changes were not done because they were not needed until the 16th, and that he left late because he was completing tasks in the box office and the booth.  According to Herbert, he accomplished all the necessary tasks, even staying late to ensure their

completion. Viewing the facts in the light most favorable to the plaintiff, it seems as though the allegations contained in the EDA dated February 21, 2007, are insufficient under the totality of the circumstances to warrant his termination. A trier of fact could find that, since the allegations in the EDA appear unreasonable, they are more likely the result of Brainard's age-related bias and consequently the decision to terminate Herbert was premised upon the discriminatorily issued EDA.

When taken individually, Herbert's assertions that National Amusement's proffered reason for termination as false may not be seen by a trier of fact as proving a discriminatory animus. However, when taken together, the facts indicate that the other Managers hired or promoted by Brainard were younger than Herbert, that Brainard promoted a much younger employee to fill Herbert's position, that one statement made by Brainard was directly related to his age while others were potentially related to Herbert's age, and that Brainard's complaints regarding Herbert's performance led to the issuance of an EDA and DMD forms for what might seem to be minor transgressions on a single day where other Managing Directors' complaints and evaluations did not. When considering these facts as a whole, a reasonable trier of fact could find that National Amusement's proffered reason for termination was a pretext for discrimination. Moreover, a reasonable juror could find that "but-for" Brainard's bias, Herbert would have never have received an EDA which prompted the issuance of the DMD and occasioned his termination.

Therefore, Defendant's motion for summary judgment is denied as to Plaintiff's ADEA claim.

CFEPA Analysis

It is well established that CFEPA claims proceed under the same analysis as ADEA claims. *Craine v. Trinity Coll.*, 259 Conn. 625, 637 n.6 (2002) (holding that the Connecticut Supreme Court looks to federal precedent when interpreting and enforcing the CFEPA); *McInnis v. Town of Weston*, 375 F. Supp. 2d 70,85 (D.Conn. 2005). Plaintiff raises the issue of whether the recent Supreme Court's decision in *Gross* also impacts the CFEPA analysis and argues that *Gross*'s "but-for" causation standard shouldn't apply and that the traditional mixed-motive analysis still governs claims under the CFEPA. The Court notes that no Connecticut state courts nor any Federal courts applying Connecticut state law have yet addressed if and how *Gross* impacts the CFEPA analysis at this stage in the proceedings. However this Court would not assume slavish deference to a new standard adopted by another court. Until such time as the Connecticut courts adopt the new standard, it will follow existing Connecticut court pronouncements on the appropriate standard to employ in applying Connecticut law, nevertheless, since Plaintiff has met the more stringent "but-for" standard the Court need not address whether the mixed-motive analysis is still applicable to CFEPA claims. Since the foregoing

ADEA analysis applies to Plaintiff's CFEPA claims, Defendant's motion for summary judgment is also denied as to Plaintiff's CFEPA claims.

<u>Termination in Violation of Public Policy Analysis</u>

Defendant moves to dismiss Plaintiff's common law claim for termination in violation of public policy. Herbert argues that his termination was based, in part, on the fact that he submitted a written response to the DMD form indicating his disagreement with the EDA which provoked the issuance of the DMD. Herbert points to a Connecticut law which provides employees with the right to submit a written statement disagreeing with any information contained in that employee's personnel or medical records. Conn. Gen. Stat. § 31-128e. Herbert essentially argues that he cannot be terminated based on the exercise of his rights under Conn. Gen. Stat. § 31-128e without violating the public policy embodied within that statute.

The cause of action for termination in violation of public policy provides a limited exception to the general rule permitting at-will employment in Connecticut. *Storm v. ITW Insert Molded Prods., a Div. of Illinois Tool Works, Inc.*, 400 F. Supp. 2d 443, 446-447 (D.Conn. 2005) ("This exception is a 'narrow one' and 'courts should not lightly intervene to impair the exercise of managerial discretion or to foment unwarranted litigation'... this exception is not intended to subsume all unfair dismissals, only those which have the purpose or effect of subverting some

unprotected public policy, otherwise the at-will doctrine would become meaningless.")(*quoting* Burnham v. Karl & Gelb, P.C., 252 Conn. 153, 165, (2000)).

The Court further notes that "not every statute will give rise to a cause of action for wrongful discharge in violation of public policy. 'Absent unusual circumstance, we will interfere with a personnel decision only if it implicates an explicit statutory or constitutional provision or judicially conceived notion of public policy.'" *Campbell v. Windham Cmty. Mem'l Hosp., Inc.,* 389 F. Supp. 2d 370, 380-381 (D. Conn. 2005)(*quoting Daley v. Aetna Life & Cas. Co.,* 249 Conn. 766, 803 (1999)). Defendant argues that Herbert has failed to articulate an important public policy and that Conn. Gen. Stat. § 31-128e does not reflect a general public policy concern warranting an exception to the at-will employment rule.

However in a recent case, another Judge from this District found that "[a] discharge premised on the simple fact that an employee disagrees with any of information contained in her personnel file and brings this disagreement to the attention of her employer violates the public policy expressed by Conn. Gen. Stat. § 31-128e." *Campbell*, 389 F. Supp. 2d at 381. The *Campbell* court concluded that the "public policy expressed by the statute does not create an unlimited right for an employee to submit a written statement to her employer" and suggested that there would be violation of public policy only if the termination was based solely on the fact that Plaintiff submitted a reply as opposed to the content of that reply.

*Id.* (finding that "Campbell has, however, created a question of material fact regarding the role her response played in Windham's decision to terminate her. Windham does not point to any inflammatory comments in Campbell's evaluation reply that might reasonably support a decision to terminate her. It is a question for the finder of fact whether Windham's decision to terminate Campbell was based on the fact that she submitted a reply or the content of that reply."). The Court is therefore mindful not to take an overly broad approach in evaluating such causes of action as poorly-performing employees should not be able to insulate themselves from discipline or termination by simply filing a disagreement to negative evaluations.

In the instant case, Defendant argues that Herbert was terminated as a result of his long history of poor performance and his refusal to complete the DMD form by failing to list the steps and actions he would take to improve his performance. Defendant further argues that in accordance with Conn. Gen. Stat. § 31-128e Herbert was given the opportunity to file a written response which was properly filed in his personnel records. There is no dispute between the parties that Herbert failed to properly complete the DMD form and that his termination was occasioned by his response to the DMD form. In addition as Defendant's note, there is no dispute that the decision to terminate Herbert did in part stem from Herbert's failure to complete the DMD form and therefore was not solely based on the fact that he submitted a reply memo in conjunction with the DMD form.

Further, Herbert had throughout his employment at National Amusements exercised his rights under Conn. Gen. Stat. § 31-128e without suffering any adverse employment actions by submitting reply or rebuttal memos indicating his disagreement with prior evaluations and EDAs. For example, Herbert wrote a rebuttal memo indicating his disagreement with a January 2004 EDA and did so again in connection with a December 2005 EDA. [Doc. # 36-10, Exs. 34, 35]. In addition, Herbert submitted a written rebuttal to his January 2007 performance evaluation by Brainard and again in connection with his DMD form. [Doc. # 36-13, Exs. Ex. 48 and Doc. # 36-13, Ex. 49]. A reasonable juror could conclude that since Herbert routinely submitted rebuttal and reply memos and was not disciplined or terminated on the basis of those memos that his termination was not solely based on his DMD reply memo. More importantly though Herbert, himself, argues that principally his termination was the result of age discrimination and therefore by his own admission Herbert acknowledges that his termination did not result from the "simple fact" that he disagreed with the 2007 EDA and DMD. *See Campbell*, 389 F. Supp. 2d at 381. Accordingly, Defendant's motion for summary judgment as to Plaintiff's claims for termination in violation of public policy is therefore granted.

<u>Conclusion</u>

The Defendant's motion for summary judgment [Doc. #36] is DENIED as to the Plaintiff's claims under the ADEA and the CFEPA, and GRANTED as to the Plaintiff's claims for termination in violation of public policy.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant

United States District Judge

Dated at Hartford, Connecticut: June 16, 2011